U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 22 2010

CLERK, U.S. DISTRICT COURT
By_____
          Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JESSIE J. BUITRON,             §
        PLAINTIFF,             §
                              §
VS.                            §    CIVIL ACTION NO. 4:08-CV-595-A
                              §
MICHAEL J. ASTRUE,             §
COMMISSIONER OF SOCIAL SECURITY, §
        DEFENDANT.             §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

The following statement of the case is taken from Plaintiff's Appeal Brief, filed September

3, 2008.[1] Buitron's instant appeal pertains to a closed period of alleged disability from June 25, 2004

to September 27, 2006. Buitron filed his first application for disability insurance benefits under Title

II of the Social Security Act on December 10, 2002. His application and motion for rehearing were

denied, and, after a hearing before an administrative law judge ("ALJ") on May 10, 2004, the ALJ

---

[1] In Defendant's Brief ("Resp. Br."), filed June 1, 2009, Defendant stipulates to Plaintiff's recitation of the procedural history, but not to the factual or legal consequences therein. Accordingly, the Statement of the Case is taken from Plaintiff's Appeal Brief ("Pl. Br.") with supplementation from the record.

found that Buitron was not disabled.  The Appeals Council denied Buitron's request for review, and the Federal district court denied his action for review of the ALJ's decision, affirming the ALJ's decision that Buitron was not under a disability from his alleged date of onset through the date of the ALJ's decision on June 24, 2004.  Less than a month later, on July 12, 2004, the Veteran's Administration ("VA") ruled that Buitron was entitled to individual unemployability effective October 13, 2003, at which time the VA determined Buitron became permanently and totally disabled due to post-traumatic stress disorder ("PTSD").  (Record ("Rec.") 509.) ("Pl. Br.") 2.)

On August 3, 2004, Buitron filed a second application for a discrete period of disability and disability insurance benefits under Title II of the Social Security Act, and his claims were again denied initially and on reconsideration.  (Rec. 428-32; Pl. Br. 2.)  After a timely appeal and request for a hearing, on August 8, 2006 a hearing was held before ALJ Jack W. Raines.  Buitron testified (Rec. 772-87), and a vocational expert ("VE") also testified.  (Rec. 787-91.)  (Pl. Br. 2-3.) Ultimately, the ALJ issued his decision on September 26, 2006, finding that Buitron was not disabled and denying him benefits for the period of June 25, 2004 through September 25, 2006.  The ALJ also dismissed Buitron's request for a hearing concerning the issue of disability on or before June 24, 2004, applying the *res judicata* doctrine.  (Rec. 383.)  Buitron re-filed in November of 2006, however, and he was approved for Disability beginning September 26, 2006.  (Pl. Br. 4.)

Buitron timely requested review of the ALJ's September 26, 2006 decision, and the Appeals Council denied his request for review in a decision dated June 13, 2008.  (Rec. 373.)  Buitron then filed the instant action in federal court.  (doc. #1.)

B.    STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled.

If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A denial of benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

C.    ISSUES

    1.    Whether the ALJ complied with relevant legal standards and reached a decision that is supported by substantial evidence.

D.    ADMINISTRATIVE RECORD

    1.    Treatment History

The administrative record provides the following information about Buitron's impairments: Buitron was born on December 23, 1948, making him an individual of advanced age for all times

relevant to the disability determination. (Rec. 390.) He obtained a GED and completed two years of post-secondary vocational training. (*Id.*) Buitron served in the military and is a Vietnam veteran. His past relevant work is that of a machinist. (*Id.*)

Buitron's medical records reveal that he was taking anti-anxiety and anti-depressant medication prior to 1999. (*Id.* at 200.) During a September 2000 medical exam with Steven G. Eilers, a VA psychiatrist, Buitron reported suicidal ideation, periods of severe depression, sleep disturbance, paranoia, adverse side effects from his anti-anxiety and anti-depressant medications, nightmares and flashbacks related to his time in combat in Vietnam, as well as an inability to control his temper and feelings of aggression toward "Orientals" in the workplace. (*Id.* at 267-273.) Eilers diagnosed Buitron with major depressive disorder ("MDD") and post-traumatic stress disorder ("PTSD") resulting in job problems and a global assessment of functioning ("GAF") of 50. (*Id.* at. 272.)

During the time period from 2000 to 2006, Buitron received consistent diagnoses of MDD and PTSD through regular visits with physicians and psychologists for treatment. He was prescribed various medications for treatment of these conditions, including Xanax, Clonidine, Paxil, Ativan, Nefazodone, Buspar, Depakote and Valium. The medical records reveal that Buitron experienced numerous problems with side effects of the various medications. (*Id.* at 23-319, 693, 700.)

According to Buitron's medical records, he took early retirement from Corning Cable in 2001, which caused increased depressive and PTSD symptoms. (*Id.* at. 239.) When Buitron attempted to go back to work, he was unable to pass employment pre-screens (*Id.*) The record also demonstrates that Buitron briefly returned to work in 2002, but that he reported having difficulty

working because of the "large number of Asians working," causing him to be uncomfortable and anxious and leading him to take his lunch alone. (*Id.*) He changed to the third shift because he thought there would be fewer Asians, but quit work when that proved to be untrue. (*Id.*)

On April 19, 2004, Lisa Alloju, a doctor of osteopathic medicine, completed a Medical Assessment of Ability to Do Work Related Activities (Mental), assessing Buitron's abilities to deal with the public, relate to coworkers, deal with work stress, function independently and demonstrate reliability. (*Id.* at 345.) The assessment revealed that Buitron's abilities in these areas were almost absent. (*Id.*) Alloju also assessed Buitron's abilities to understand, remember and carry out detailed and simple job instructions and to behave in an emotionally stable and predictable manner, and found that these abilities were likewise almost absent. (*Id.* at 346.) Alloju assessed Buitron's ability to maintain concentration and attention as nonexistent. (*Id.* at 345.) Alloju's assessment from this time states that Buitron suffers from anxiety, psychosis and disorganized thoughts that impair his occupational and social functioning and his activities of daily living. (*Id.* at 346.) According to Alloju's assessment, Buitron was disabled prior to June 25, 2003, when she first met with him. (*Id.* at 347.)

On April 19, 2004, Alloju also completed an assessment of the evidence and symptoms supporting her diagnoses of PTSD, psychosis, affective disorder and anxiety disorder and noted that Buitron's mental disorders meet the "C" criteria of the listings. (*Id.* at. 349-360.) Alloju noted that Buitron's anxiety-related disorder has resulted in a complete inability to function outside the home. (*Id.*)

On October 6, 2004, Buitron underwent a psychiatric evaluation by Tara Reddy, M.D. (*Id.*

at 590-92.) Reddy's evaluation states that Buitron has a four-year history of depression, flashbacks and nightmares related to the trauma he experienced in Vietnam as well as moodiness and negativity. (*Id.*) Her report indicates that Buitron had threatened his coworkers and supervisors, and that he lacked energy, motivation and concentration, and that he was paranoid, angry and irritable. (*Id.*) The report also mentions that Buitron was hospitalized for depressive symptoms in 2000. (*Id.*) Reddy diagnosed Buitron with MDD and PTSD with resulting social environmental, economic and occupational problems and assigned Buitron a GAF of 52-54 with a fair prognosis with further and continued treatment. (*Id.* at 592.)

A few weeks after Reddy's evaluation took place, on October 27, 2004, C. Langford, Ph. D., completed a Mental RFC Assessment and a Psychiatric Review Technique Form (*Id.* at 617-33.) Langford concluded that Buitron was limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration, perform within a schedule, maintain attendance and punctuality, work in coordination with and proximity to others, complete a normal workday and workweek, interact appropriately with the general public, coworkers and supervisors and respond appropriately to changes in the work setting. (*Id.* at 617-18.) The Psychiatric Review Technique showed that Buitron suffered from recurrent MDD as well as PTSD (*Id.* at 624-26.) The assessment also noted limitations in activities of daily living, social functioning, concentration, persistence and pace. (*Id.* at 631.)

On July 27, 2006, Buitron's treating physician, Saba Razi-Syed, a psychiatrist, completed a Mental Impairment Questionnaire which also stated diagnoses of depression and PTSD with an onset date of August 2000. Razi-Syed assigned Buitron a GAF of 48. (*Id.* at 728.) The doctor reported

follow-up visits with Buitron every two to three weeks as well as treatments which included pharmacotherapy and supportive therapy to which Buitron only gave a fair response. (*Id.*) Razi-Syed stated that Buitron had a fair to poor prognosis, and noted symptoms of anxiety, depression, irritability and thoughts of suicide and dizziness as side effects of Buitron's medication. (*Id.*)

Razi-Syed stated that Buitron was limited in his activities of daily living and maintaining concentration, persistence and pace and was also limited in maintaining social functioning. (*Id.* at 730.) The doctor found that Buitron's ability to work was limited in the ability to carry out short and simply instructions, make simple work-related decisions, ask questions or request assistance, be aware of hazards and take precautions, understand and remember detailed instructions, and adhere to standards of cleanliness and neatness. (*Id.* at 731-32.) According to Razi-Syed's assessment, Buitron was seriously limited in his ability to remember work procedures, understand and remember short and simple instructions, maintain attention for two hours, accept instructions and criticism from supervisors, get along with coworkers, carry out detailed instructions, set goals and make plans, maintain socially appropriate behavior with the general public, and use public transportation. (*Id.*) The doctor found that Buitron was unable to meet competitive work standards in his ability to maintain regular attendance, sustain a routine, work in coordination or proximity with others, complete a normal workday or workweek, perform at a consistent pace, and respond to changes and stress in the workplace. (*Id.*)

 2. Administrative Hearing

At his hearing before the ALJ, Buitron testified that he was fifty-five years old and had a GED. (*Id.* at 41.) He testified that he had most recently worked for two months as a machine

operator from May to June 2002, but that he had quit working because of anxiety and panic and that he "just couldn't manage there." (*Id.* at 42.) Buitron testified that the most recent time he had worked prior to May-June 2002 was in October 2001, when he was also working as a machine operator. (*Id.*) He left that job when he was offered early retirement. (*Id.*) Buitron testified that from June 2002 when he last worked until the date of the hearing he mostly stayed home and that he didn't "really do anything." (*Id.* at 43.) According to Buitron, he had trouble with concentration, panic, and anxiety, which had caused him to miss a lot of work. (*Id.*) Additionally, he stated that the quality of his work had gone down and that he was written up for poor production and quality. (*Id.*) He testified that he had been having problems for a while before September 11, 2001, but that the attack on the World Trade Center triggered worse depression and anxiety. (*Id.* at 44.)

When questioned by his attorney about his history of marijuana use, Buitron testified that he had been using the drug, but that he had quit in October 2003, about seven months before the hearing before the ALJ. (*Id.*) He testified that he had used marijuana to sleep and to try to calm down. (*Id.*) He stopped smoking marijuana, he stated, after Alloju prescribed Buitron Depakote and Ambien, which Buitron stated helped him get to sleep. (*Id.*)

Buitron also testified about having panic attacks and arthritis which caused him problems in using his hands. (*Id.* at 45.)   Finally, his attorney asked him about his difficulties with anger management and rage, and Buitron testified that these were a "real bad problem" at work, causing him to be written up for threatening a supervisor and other employees. (*Id.*) He said he was on probation for probably ten of the thirteen years he worked at his job that ended in October 2001. (*Id.*) Finally, Buitron testified that he had problems with depression and racing thoughts as well as

-9-

concentration. (*Id.*)

Medical expert John Simonds, a medical doctor and psychiatrist, testified after reviewing Buitron's medical records and listening to his testimony. (*Id.* at 46-47.) He testified that medically, Buitron had some hypertension that appeared to be under good control. (*Id.* at 47.) After reviewing Buitron's psychiatric records, Simonds summarized that Buitron had been diagnosed at times with an anxiety disorder, PTSD and a panic disorder, but that his problems did not meet the listing because there was not a time of severe impairment for a year and because various notes in the record indicated improvement, overall improvement and improvement with medications and no mania and self-reports of no depression. (*Id.* at 49.) Simonds stated that Buitron did not meet the listings in 12/04 for bipolar or 12/06 for anxiety. He said Buitron would have some limitations related to his difficulty getting along with his co-workers and supervisors and thus he should probably have minimal exposure to the public and co-workers. He also noted Buitron's non-compliance with taking his medication. (*Id.* at 48-49.)

Vocational expert Donna Humphries testified that Buitron's prior relevant work experience as a machine operator was medium and skilled with a specific vocational preparation time ("SVP")[2] of five. The ALJ asked the VE to consider a hypothetical claimant with the same age, education and work experience as Buitron who was limited to work that was simple and repetitive in nature, requiring only incidental contact with the public and the lower end of detailed work instructions.

---

[2] SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. *Dikeman v. Halter*, 245 F.3d 1182, 1186 n. 2 (10th Cir. 2001); U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App. B., B-1 (1993). Higher SVP ratings indicate that it takes more time for the worker to learn the job.

As to whether there would be any work existing in the national economy that such an individual could perform, the VE responded that there would be approximately 7,500 light level machine tending type positions in Texas and approximately 150,000 in the national economy. (*Id.* at 64.) She also noted that there would be hand packing type positions at the light, medium and sedentary level – approximately 18,000 in Texas and 380,000 in the national economy. (*Id.*) Finally, she stated that there are manual hand labor type positions at the sedentary, light and medium levels – approximately 70,000 in Texas and one million in the national economy. (*Id.*) She admitted that none of those jobs would insulate the hypothetical claimant from working with people of other races, such as Asian people. (*Id.*) When questioned by Buitron's attorney as to whether such a claimant could perform the jobs listed if he had poor ability to function, she said no. (*Id.* at 66.) She also said that if the person was unable to be emotionally stable in the workplace they would also be limited in their ability to perform the jobs listed. (*Id.* at 67.)

> 3.    The ALJ's Decision

In entering his decision, the ALJ found that Buitron's last insured date under the Social Security Act was December 31, 2008. (*Id.* at 384.) The ALJ then followed the required five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a). (*Id.* at 384-385.) At step one, the ALJ found that Buitron had not engaged in substantial gainful activity from June 25, 2004 through September 26, 2006, the date of the decision. (*Id.* at 384-85.) At step two, the ALJ found that Buitron had two severe impairments: MDD and PTSD (20 C.F.R. 404.1520©, but the ALJ found that these impairments did not meet or equal a listing at step three of the disability analysis. (*Id.* at 385-86; 20 CFR Part 404; Subpart P, Appendix 1 (20 CFR 404.1525 and

404.1526).)  The ALJ also noted Buitron's history of marijuana use and noncompliance in failing

to take his medication as directed and failing to keep follow up appointments with the VA.  (*Id.* at

386.)

  The ALJ formulated a residual functional capacity ("RFC") for Buitron, finding that Buitron

could still perform work that requires occasionally lifting and carrying 50 pounds and frequently

lifting and carrying 20 pounds.  (*Id.* at 387.)  The ALJ found that Buitron was able to stand for 6

hours in an 8-hour work day, sit for 6 hours, and that he needed to avoid all exposure to excessive

cold, vibration and unprotected heights.  (*Id.*)  Notably, the ALJ's finding listed excessive cold as

a limitation, rather than excessive heat, which was the limitation he proposed in his hypothetical to

the VE.  The ALJ also found that Buitron was able to perform detailed but not complex work and

that he could not have any contact with the public and only occasional contact with coworkers.  (*Id.*)

The ALJ specifically stated that he had given little weight to the opinion of Buitron's treating

physician, Razi-Syed, because the doctor stated that Buitron did not use drugs or alcohol even though

Buitron had freely admitted a history of drug and alcohol abuse in his VA records and had a positive

lab screen for marijuana use as recently as April 2006.  (*Id.* at 389.)  The ALJ found that there were

no documented episodes of the decompensation Razi-Syed had spoken of in the record, stating that

the doctor was not specific and that there were no supporting references provided.  (*Id.*)

  After determining Buitron's RFC, the ALJ proceeded to step four of the analysis and found

that Buitron was unable to perform his past relevant work as a machinist, a job characterized by the

vocational expert as medium exertional, skilled (SVP-7) work.  (*Id.*.)  Then in step five the ALJ

found that, taking into consideration Buitron's age, education, work experience and RFC, Buitron

had acquired work skills from past relevant work that could transfer to other jobs existing in significant numbers in the national economy. (*Id.* at 390; 20 CFR 404.1560©; 404.1566 and 404.1568(d) .) These skills included setting up and applying knowledge of machines, using machines to fabricate, buff or polish, and use of blue prints and adjusting machine controls to meet specifications. (*Id.*) After making this finding, the ALJ ultimately concluded that Buitron was not disabled under the meaning of the Social Security Act as he could perform light exertional, semi-skilled work such as a buffing machine operator, a bench worker and a metal finisher. (*Id.*)

E.     DISCUSSION

Buitron contends that the ALJ erred by relying on allegedly flawed vocational evidence and that his decision was not supported by substantial evidence. (Pl. Br. at 10.) He claims that the jobs listed by the VE and by the ALJ as jobs a person could perform with limitations requiring avoidance of excessive heat and vibrations conflict with those limitations. (*Id.* at 11.) Buitron complains that the ALJ's statement of Buitron's limitations in his order (no excessive cold) differed from the limitations he presented in his hypothetical to the VE during Buitron's hearing. Moreover, Buitron maintains that, according to the Dictionary of Occupational Titles ("DOT"), a buffing machine operator is frequently exposed to vibration, and a metal worker and a bench worker are exposed to excessive heat. (*Id.*; United States Dept. of Labor, Dictionary of Occupational Titles, 603.382-010, 705.684-034, and 616.485-010.)     According to Buitron, the discrepancy between the job requirements and the VE's testimony creates an unresolved conflict for which the ALJ must provide a reasonable explanation. (*Id.*; Social Security Ruling ("SSR") 00-4p.) Thus, Buitron maintains that the ALJ's step five finding is not supported by substantial evidence because none of the jobs

included in the VE's testimony support the ALJ's finding at step five that Buitron can perform jobs existing in significant numbers in the national economy. (Pl. Br. at 12; Rec. 390); *Cook v. Astrue*, 2009 WL 129583 at *4 (N.D. Tex. Jan. 16, 2009) (noting that the ALJ has an affirmative duty to question the VE as to whether there is a possible conflict between the evidence presented by the VE and information provided in the DOT). Buitron argues that because SSR 00-4p required the ALJ to question the VE as to whether her testimony conflicts with information provided in the DOT. (Pl. Br. at 12.) and because the ALJ failed to do so (Rec. 789-90), the ALJ's decision stating that the VE's testimony is consistent with the DOT (Rec. 390) is not compliant with relevant legal standards and warrants reversal. (Pl. Br. at 12.)

The Commissioner responds that the ALJ's use of the word "cold" instead of "heat" and his failure to ask the VE whether her testimony conflicted with the DOT pursuant to SSR 004-p is harmless error because the VE's testimony was consistent with the DOT. (Resp. at 4; Rec. 787-90.) First, as to the position of buffing machine operator, DOT § 603.382-010, the DOT states that the position requires neither extreme heat or cold, and that the activity or condition does not exist. Likewise, the position lists vibration as not present, stating that the activity or condition does not exist. The same is true of the position of metal finisher. (DOT § 616.485-010) and bench worker (DOT § 616.485-010). DOT (4th ed., rev. 1991). Thus, there is no conflict between the information provided in the DOT and the VE's testimony, and the ALJ's failure to ask the VE whether her testimony conflicted with the DOT is harmless error and is therefore not a basis for reversal or remand. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (holding that a reviewing court should not overturn an ALJ's decision absent a showing of prejudice to the claimant's substantial

rights).

In his reply, Buitron acknowledges that the DOT does not specifically exclude Buitron's performance of the three positions identified by the VE in response to the ALJ's hypothetical. He then argues, with no citation to case law, that 20 C.F.R. §§ 404.1566(d) and 416.966(d) require the Commissioner to take notice of "reliable job information" available from governmental and other publications and that the Commissioner should take notice of the relevant job descriptions contained in the O*NET database. (*Id.* at 2.) Buitron made this same argument in his September 19, 2007 letter to the appeals counsel. (Rec. 768.) The statutes Buitron relies upon specifically use the word "publication," and each of the examples contained in the statutes are publications printed by various governmental entities. Buitron has not supplied the court with any legal authority for this argument, and the court will therefore not consider it. The law of the Fifth Circuit does not require procedural perfection in administrative proceedings, and a reviewing court should not overturn an ALJ's decision unless the claimant has demonstrated prejudice his substantial rights. *Mays*, 837 F.2d at 1364. The Court finds that the ALJ did not fail to comply with relevant legal standards in relying on the VE's testimony.

Next, Buitron claims that the ALJ's decision must be reversed for lack of substantial evidence because the ALJ did not properly consider the totality of the evidence, including: (1) the VA's finding of disability, Buitron's diagnosis and treatment before and after the closed period, and (3) the assessment of Buitron's treating physician. (Pl. Br. at 12-17.)

Buitron acknowledges that the ALJ did not reopen Buitron's prior application. (Rec. 386, 505-08, 772.) And in fact the ALJ properly limited his consideration of the evidence to the period

of June 25, 2004, when the ALJ applied the doctrine of *res judicata* to an unfavorable June 24, 2004

decision. (Rec. 23-36); 383; 20 C.F.R. §§ 20 C.F.R. §§ 404.957(c)(stating that an ALJ may refuse

to consider issues about which the Commissioner has made a previous determination); *see also*

*Raymon v. Shalala*, 39 F.3d 320, 1999 WL 612377, *1 (5th Cir. October 21, 1994).)  Moreover,

disability determinations for Social Security Benefits are reserved for the Commissioner, not other

federal agencies. *See Moor v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990); 20 C.F.R. § 404.1527(e).

      Buitron next argues that the ALJ failed to comply with applicable legal standards by giving

improper weight to the assessment of Buitron's treating physician, Razi-Syed. (Pl. Br. at 16 (citing

*Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (opinions of social security disability claimant's

treating physician is entitled to great weight); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th. Cir.

1994) (same).)  The cases relied upon by Buitron, however, both explain that although the treating

physician's testimony should be accorded considerable weight, "when good cause is shown, less

weight, little weight, or even no weight may be given to the physician's testimony." *Greenspan*, 38

F.3d at 237; *see also Leggett*, 67 F.3d 566).  Good cause for disregarding or giving lower weight to

a treating physician's statement includes cases where the treating physician's statements are brief

and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or

supported by other evidence. *Leggett*, 67 F.3d at 566.

      One of the reasons the ALJ gave for giving Razi-Syed's testimony less weight was that the

doctor stated that Buitron did not use drugs since Buitron had a history of drug use and had tested

positive as recently as April 7, 2006, just a few months prior to the doctor's assessment of Buitron

on July 25, 2006. (Rec. 289, 690.) Buitron argues that dismissing Razi-Syed's opinion on this basis

-16-

was not proper because at the time of the assessment, Buitron was not currently using marijuana and

had not tested positive since April of that year. (Pl. Br. at 17-18.) The record as a whole, however,

supports the ALJ's review of the medical evidence. Buitron's marijuana abuse was addressed when

he obtained dental care in January 2005, (Rec. 607), and another physician, Venkata R. Pandilipalli,

noted Buitron's history of marijuana abuse on April 7, 2006. (*Id.* at 698.) The Commissioner may

reject the opinion of any physician when evidence in the record supports a contrary conclusion.

*Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987). Moreover, the ALJ also stated as a basis

for his rejection of Razi-Sayed's opinion the fact that the record contained insufficient evidence to

support the doctor's statements that Buitron experienced episodes of decompensation during the

relevant time period. Buitron has established that the ALJ's finding regarding episodes of

decompensation is not supported by substantial evidence from the relevant time period – June 25,

2004, the date the ALJ applied the doctrine of *res judicata* through September 26, 2006, the date of

the ALJ's unfavorable opinion.

Buitron also argues that the ALJ used Buitron's noncompliance with treatment and history

of illegal drug use as a basis for his conclusion, even though the ALJ did not specifically indicate

that was the case. (Pl. Br. at 17-18; Pl. Rep. Br. at 7.) Buitron urges the court to infer from the

ALJ's reasoning that the ALJ's finding of disability was based on Buitron's lack of compliance. (*Id.*

(citing *Grubb v. Apfel*, 2003 WL 23009266 at *5 (S.D.N.Y Dec. 22, 2003). In light of all of the

evidence in the record, Buitron has failed to demonstrate that the court should infer that the ALJ's

decision was based upon Buitron's non-compliance.

Finally, Buitron argues that the ALJ erred in finding that Buitron's statements concerning the

severity of his condition were not credible, and he claims that the ALJ failed to accommodate

Buitron's alleged panic attacks, concentration and memory problems, and problems with co-workers.

(Pl. Br. at 20.) It is well-established that an ALJ's credibility assessment is given great deference.

*See, e.g.*, Newton v. *Apfel*, 209 F.3d 448, 459 (5th. Cir. 2000); *Chambliss v. Massanari*, 269 F.3d

520, 522 (5th. Cir. 2001).

Substantial evidence, however supports the ALJ's assessment of Buitron's RFC.  First,

Reddy noted in the psychiatric evaluation she conducted of him on October 6, 2004 that Buitron had

a good remote memory, intact immediate recall, and impaired concentration.  (Rec. 386, 591.)  On

July 18, 2006, Buitron's treating physician, Saba Razi-Syed, noted that Buitron had fair eye contact,

linear and goal-directed thought processes, and fair insight and judgment.  (*Id.* at 387, 393.)  The

findings of these two doctors contradict Buitron's claim that he was unable to complete tasks or

would make mistakes.  (Pl. Br. at 21.)  The ALJ's conclusion that Buitron could perform detailed

but not complex work, could not have contact with the public, and was limited to occasional contact

with co-workers is supported by substantial evidence.

Next, Buitron's claim that the ALJ erred in failing to address the side effects of Buitron's

medication is not supported by substantial evidence.  During his October 5, 2004 assessment,

Buitron reported that the combination of Paxil and Xanax he was taking was "the best combination

that he ever had." (Rec. 590.)  On April 11, 2006, just three months before the hearing, Buitron

reported that he was stable on his medication and that there were no noticeable side effects.  (*Id.* at

388, 695.)  And, when Razi-Syed examined Buitron on July 18, 2006, Buitron reported that he

wanted to continue taking Paxil and stated that he was not taking Xanax at that time because he ran

out of it and did not want to be involved in therapy. (*Id.* at 387, 693.)   The ALJ's findings that

Buitron was not taking his medications as prescribed was supported by Buitron's own testimony at

the hearing that he did not always take the recommended dosage. (*Id.* at 389, 785.) Thus,

substantial evidence supports the ALJ's finding that Buitron's statements regarding his condition

were not "entirely credible." (*Id.* at 389.)

F.     CONCLUSION

        The court finds that the Commissioner's decision is supported by substantial evidence and

has not been shown to be the result of legal error.


                         RECOMMENDATION

        It is recommended that the Commissioner's decision be affirmed.


                NOTICE OF RIGHT TO OBJECT TO PROPOSED
            FINDINGS, CONCLUSIONS AND RECOMMENDATION
             AND CONSEQUENCES OF FAILURE TO OBJECT

        Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific

written objections in the United States District Court to the United States Magistrate Judge's

proposed findings, conclusions and recommendation within ten (10) days after the party has been

served with a copy of this document. The court is hereby extending the deadline within which to file

specific written objections to the United States Magistrate Judge's proposed findings, conclusions

and recommendation until April 13, 2010. The United States District Judge need only make a *de*

*novo* determination of those portions of the United States Magistrate Judge's proposed findings,

conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until April 13, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED MARCH 22, 2010.

CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE